**Thomas Lee ROGERS, Appellant (Defendant below),**

v.

**STATE of Indiana, Appellee (Plaintiff below).**

No. 45S00–9608–CR–568.

Supreme Court of Indiana.

Sept. 8, 1998.

· James F. Stanton, Crown Point, for Appellant.

Jeffrey A. Modisett, Attorney General, Preston W. Black, Deputy Attorney General, Indianapolis, for Appellee.

SULLIVAN, Justice.

Indiana prohibits sentencing a mentally retarded defendant to death or to life imprisonment without parole. We review here, for the first time, the statutory procedures for determining mental retardation in this context.

*Background*

Defendant, Thomas Lee Rogers, worked for his brother as an electrician's helper. On February 13 and 14, 1995, defendant assisted with some electrical work at the home of seventy-two year old Virginia Cates. On February 23, 1995, defendant drove to Cates's home to acquire some money to buy drugs. Defendant took $50 from Cates's purse and forced her into the car he was driving. He then drove to a crowded overpass, and threw or pushed Cates's body to the heavily-traveled interstate highway below. Cates was still alive when she hit the pavement. Cates attempted to stand up, but

two vehicles ran over her in rapid succession, killing her.

Based on this series of events, the State charged defendant with Murder,[1] Felony Murder,[2] and Confinement, a class B felony,[3] and sought a sentence of death or life imprisonment without parole.[4] Pursuant to Ind. Code § 35–36–9–4, defendant filed with the trial court a motion to evaluate defendant as mentally retarded to determine whether he was ineligible for either sentence sought by the State.[5]

In a preliminary hearing, the trial court determined that defendant was not mentally retarded. On February 9, 1995, a jury convicted defendant of Murder, Felony Murder, and Confinement. In a separate proceeding, the same jury recommended a sentence of death. The trial court declined to follow the jury's recommendation and instead imposed a sentence of life imprisonment without parole for the murder conviction, and an enhanced forty year sentence for the confinement conviction.[6]

Defendant now appeals the sentence of life imprisonment without parole. We have jurisdiction over this direct appeal pursuant to Ind. Const. art. VII, § 4, and Ind.Appellate Rule 4(A)(7).

### Discussion

Defendant presents for our consideration two issues: (1) whether the clear and convincing standard of proof required by Ind. Code § 35–36–9–4 for a showing of mental retardation violates due process; and (2) whether the trial court erred in finding defendant not to be retarded within the meaning of Ind.Code § 35–36–9–2. As a preliminary matter, we observe that these statutes are part of a larger scheme which prescribes the procedure to follow in a pretrial determination of mental retardation. *See* Ind.Code §§ 35–36–9–1 to –7 (Supp.1994) (the "Mental Retardation Statute").

I

Defendant contends that, based on the Supreme Court's recent holding in *Cooper v. Oklahoma,* 517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996), the clear and convincing standard of proof set forth in Ind.Code § 35–36–9–4 violates defendant's constitutional right to due process of law. U.S. Const. amend. V; amend. XIV, § 1. Ind.Code § 35–36–9–4 provides in pertinent part:

> At the hearing [on the petition alleging mental retardation], the defendant must prove by clear and convincing evidence that the defendant is a mentally retarded individual.

Ind.Code § 35–36–9–4(b) (Supp.1994).[7] A finding of mental retardation renders the defendant ineligible for sentences of death or life imprisonment without parole. Ind.Code § 35–50–2–9 (Supp.1994).

In *Cooper,* the Supreme Court confronted a challenge to a statute which required a criminal defendant to prove by clear and convincing evidence his or her incompetence to stand trial. Acknowledging that "the criminal trial of an incompetent defendant violates due process" (citing *Medina v. California,* 505 U.S. 437, 453, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992)), the Court held that "[b]ecause Oklahoma's procedural rule allows the State to put to trial a defendant who is more likely than not incompetent, the rule is incompatible with the dictates of due process." *Cooper,* 517 U.S. at 354, 369, 116 S.Ct. 1373.[8]

---

1. Ind.Code § 35–42–1–1 (1993).

2. *Id.*

3. Ind.Code § 35–42–3–3 (1993).

4. Ind.Code § 35–50–2–9 (1993 and Supp.1994).

5. *Id.* ("state may not proceed against a defendant under this section if a court determines at a pretrial hearing under IC 35–36–9 that the defendant is a mentally retarded individual").

6. Defendant pled guilty to being a habitual offender. *See* Ind.Code § 35–50–2–8 (1993 and Supp.1994) (court shall impose enhancement of up to thirty years if State proves beyond reasonable doubt defendant has two prior unrelated felony convictions).

7. "Mentally retarded individual" is defined at Ind.Code § 35–36–9–2 (Supp.1994). *See* part II, *infra.*

8. In so ruling, the Court did not disturb its earlier holding in *Medina v. California,* 505 U.S. 437, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992), that a state constitutionally may require a defen-

Defendant now seeks to bootstrap the holding of *Cooper* to Ind.Code § 35–36–9–4, and asks this Court to hold that requiring clear and convincing proof of a defendant's mental retardation to determine eligibility for a sentence of death or life imprisonment without parole similarly violates due process. However, after applying the reasoning of *Cooper* to the requirements of the statute at issue, we reach a contrary result.

The Court in *Cooper* found that requiring clear and convincing evidence of competency impinged upon a "principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Cooper*, 517 U.S. at 355, 116 S.Ct. 1373 (quoting *Patterson v. New York*, 432 U.S. 197, 202, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977)). This "fundamental principle" was the right of a defendant not to stand trial while incompetent. *Id.*, 517 U.S. at 354, 116 S.Ct. 1373. *See Medina*, 505 U.S. at 453, 112 S.Ct. 2572; *Riggins v. Nevada*, 504 U.S. 127, 139–40, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992) (Kennedy, J., concurring in the judgment). *See also Brewer v. State*, 646 N.E.2d 1382, 1384 (Ind. 1995) (criminal trial of incompetent defendant violates due process). The Court held that a rule requiring clear and convincing proof of incompetency increases the risk of an erroneous determination of competency, which in turn affects the fundamental fairness of the trial itself: "Because [the incompetent defendant] lacks the ability to communicate effectively with counsel, he may be unable to exercise other 'rights deemed essential to a fair trial.'" *Cooper*, 517 U.S. at 364, 116 S.Ct. 1373 (quoting *Riggins*, 504 U.S. at 139, 112 S.Ct. 1810 (Kennedy, J., concurring in the judgment)).

■ The standard of proof set forth in Ind.Code § 35–36–9–4, although arguably permitting the same type of erroneous determination of absence of mental retardation,

does not offend a "fundamental principle" of the sort implicated in *Cooper*. In Indiana, a finding concerning a defendant's mental retardation determines only his or her eligibility for a particular criminal punishment; it does not affect the procedural fairness or outcome of that defendant's trial, provided the defendant (whether or not mentally retarded) is otherwise competent to stand trial. The Supreme Court engaged in similar analysis in *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), in which it found no constitutional proscription against the execution of a mentally retarded defendant:

> Penry was found competent to stand trial. In other words, he was found to have the ability to consult with his lawyer with a reasonable degree of rational understanding, and was found to have a rational as well as a factual understanding of the proceedings against him.
>
> \*     \*     \*     \*     \*     \*
>
> [M]ental retardation is a fact that may well lessen a defendant's culpability for a capital offense. But we cannot conclude today that the Eighth Amendment precludes the execution of any mentally retarded person of Penry's ability convicted of a capital offense simply by virtue of his or her mental retardation alone.

*Penry*, 492 U.S. at 333, 340, 109 S.Ct. 2934.

The defendant in *Penry* argued that mentally retarded people do not possess the requisite level of moral culpability to justify imposing a death sentence, and that "there is an emerging national consensus against executing the mentally retarded." [9] *Penry*, 492 U.S. at 328–29, 109 S.Ct. 2934. Regarding the "moral culpability" argument, the Supreme Court reasoned that the insanity defense had protected (and would continue to

---

dant to overcome a presumption of competency by the lower standard of preponderance of the evidence. *See Cooper v. Oklahoma*, 517 U.S. 348, 355, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996).

**9.** The defendant also argued that his death sentence violated the Eighth Amendment because "the jury was not instructed that it could consider and give effect to his mitigating evidence [regarding mental retardation] in imposing its

sentence." *Penry v. Lynaugh*, 492 U.S. 302, 307, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). The defendant prevailed on this claim, and the Supreme Court remanded for resentencing, so as not to " 'risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty.' " *Id.* at 328, 109 S.Ct. 2934 (quoting *Lockett v. Ohio*, 438 U.S. 586, 605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)).

protect) adequately against the unconstitutional conviction and execution of those mentally retarded defendants who "wholly [lack] the capacity to appreciate the wrongfulness of their actions." *Id.* at 333, 109 S.Ct. 2934. In addressing the "national consensus" argument, the Court surveyed the laws of the states and found that only two states had statutes on the books at that time banning the execution of mentally retarded defendants.[10] *Id.* at 334, 109 S.Ct. 2934. The Court also acknowledged several public opinion polls disapproving of the execution of mentally retarded defendants.[11] *Id.* at 334–35, 109 S.Ct. 2934.

Since *Penry* was decided in 1989, many states—including Indiana—have enacted legislation prohibiting the execution of mentally retarded defendants and requiring varying standards of proof for a showing of mental retardation.[12] Although Indiana has chosen to exclude by statute the mentally retarded from the ranks of criminal defendants otherwise eligible for sentences of death or life imprisonment without parole,[13] *Penry* remains good law.[14]

■ Given that the clear and convincing standard of proof in Ind.Code § 35–36–9–4

(determining only a defendant's sentence eligibility) does not affect the fundamental procedural fairness of a defendant's trial, and that the United States and Indiana Constitutions do not prohibit the execution of a mentally retarded defendant,[15] we cannot conclude that defendant's due process rights were violated.

■ Defendant also attacks Ind.Code § 35–36–9–4 as permitting the imposition of a punishment that is (1) disproportionate to the offense he committed; and (2) vindictive justice. Ind. Const. art. I, §§ 16 and 18. We interpret defendant's claims as challenges to the appropriateness of his sentence. Defendant threw or pushed a seventy-two year old woman off an overpass onto a heavily traveled interstate highway where two vehicles hit and killed her. We cannot conclude that the trial court erred in imposing a sentence of life imprisonment without parole for this offense.

## II

Defendant challenges the trial court's finding that defendant was not mentally retarded

**10.** Ga.Code Ann. § 17–7–131 (Supp.1988); Md. Ann.Code art. 27, § 412 (1989) (effective July 1, 1989, five days after *Penry* was decided).

**11.** Although the Court concluded that there was insufficient evidence of a "national consensus" at that time of the type suggested by the defendant, it stated that such a consensus might "someday emerge reflecting the evolving standards of decency that mark the progress of a maturing society[.]" *Penry*, 492 U.S. at 340, 109 S.Ct. 2934 (internal quotation marks omitted).

**12.** Ark.Code Ann. § 5–4–618 (Michie 1995) (requiring proof of mental retardation by a preponderance of the evidence); Colo.Rev.Stat. §§ 16–9–402, –403 (1997) (clear and convincing evidence); Ga.Code Ann. § 17–7–131 (1994) (enacted prior to *Penry*; jury must find defendant guilty but mentally retarded beyond a reasonable doubt); Ind.Code § 35–36–9–4 (Supp.1994) (clear and convincing evidence); Kan. Stat. Ann. § 21–4623 (1995) (no standard); Ky.Rev.Stat. Ann. §§ 532.135, 532.140 (Michie 1990) (no standard); Md. Ann.Code art. 27, § 412 (1996) (enacted prior to *Penry*; preponderance of evidence); N.M. Stat. Ann. § 31–20A–21 (Michie 1984) (preponderance of evidence); N.Y.Crim. Proc. Law § 400–27 (McKinney 1994) (1997–1998 pocket part) (preponderance of evidence); Tenn.Code Ann. § 39–13–203 (1997) (preponder-

ance of evidence); Wash. Rev.Code Ann. § 10.95.303 (1998 pocket part) (preponderance of evidence).

**13.** Indiana Code § 35–50–2–9(a) provides that the State may not seek a sentence of death or life imprisonment without parole if a court determines that the defendant is a mentally retarded individual under the Mental Retardation Statute. The Mental Retardation Statute provides in part that it "applies when a defendant is charged with a murder for which the state seeks a death sentence." Ind.Code § 35–36–9–1. While there is no reference to the life imprisonment without parole sentence in this section, the cross-reference to the Mental Retardation Statute in Ind. Code § 35–50–2–9(a) makes clear to us the legislature's intent that the Mental Retardation Statute also applies when a defendant is charged with a murder for which the State seeks a sentence of life imprisonment without parole.

**14.** *See Allen v. State*, 686 N.E.2d 760, 786 (Ind. 1997) (finding no constitutional requirement for retroactive application of the Mental Retardation Statute).

**15.** *Penry*, 492 U.S. at 340, 109 S.Ct. 2934; *Allen*, 686 N.E.2d at 786.

within the meaning of Ind.Code § 35–36–9–2, which provides as follows:

"[M]entally retarded individual" means an individual who, before becoming twenty-two (22) years of age, manifests:

(1) significantly subaverage intellectual functioning; and

(2) substantial impairment of adaptive behavior:

that is documented in a court ordered evaluative report.

Ind.Code § 35–36–9–2 (Supp.1994).

After receiving extensive expert testimony at a pretrial hearing, the trial court found defendant not to be mentally retarded within the meaning of Ind.Code § 35–36–9–2. At judicial sentencing (after the jury had convicted defendant and recommended death), the trial court discussed the issue of mental retardation before sentencing defendant to life imprisonment without parole: ·

Now, the mitigating side, the defendant is retarded, but not, in my opinion, within the purview of the Indiana Code. Certainly, a person who is 70 IQ, and we had different readings, 69. One was even lower than that. I don't think there is any question that he is retarded in that respect. But again I found and I believe now that he is able to adapt. He was living in the community. He was working. He [w]as operating an automobile. He was living with a young lady. According to her, bringing money home. He was able to go where he wanted to go. And I don't think he would be accepted in a group home setting. I think that he would not even qualify for that.

\* \* \* \* \* \*

I find the aggravating factor to outweigh the mitigating factor that the defendant is a retarded person again, but I have to add not within the purview of the statute, but certainly in terms of his mental capacity, intellectual capacity, he has certainly met the criteria of retardation. But we differ on the adaptability.... I am satisfied now that he knew what was going on. He was able to assist you in presenting a defense.

(R. at 3041–42.) The trial court also issued written reasons for not imposing the death sentence in which it considered the following possible mitigating circumstances:

Although the evidence showed the defendant is mildly retarded, there was no evidence that he was under extreme mental or emotional disturbance when he committed the murder.

\* \* \* \* \* \*

Although the defendant is, in fact, mildly mentally retarded with an IQ of from 69 to 72 and may suffer from brain disturbances, from chronic alcoholism and drug abuse, the Court concludes that the defendant was not substantially impaired as a result thereof and has the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirement of the law.

\* \* \* \* \* \*

[Defendant's] adoptive parents were totally unequipped to deal with what we now know to be a retarded youngster.

\* \* \* \* \* \*

In weighing, evaluating and balancing the aggravating circumstances and the mitigating circumstances, the court finds the manner in which this crime was committed outweighs the significant mitigating circumstance of defendant's borderline or mild mental retardation.

(R. at 468–69.)

Defendant claims that he did not receive an adequate evaluation because none of the experts who testified at the pretrial hearing assessed defendant's adaptive behavior using a standardized test. Defendant also contends that the evidence presented at the pretrial hearing demonstrated substantial impairment of defendant's adaptive behavior, contrary to the trial court's findings. Defendant further argues that the court, by finding defendant not to be mentally retarded under Ind.Code § 35–36–9–2, effectively excluded the majority of mentally retarded individuals from the provisions of the Mental Retardation Statute.

## A

As conceptualized by Ind.Code § 35–36–9–2, mental retardation involves an inquiry into two areas: intellectual functioning and adaptive behavior.[16] Intellectual functioning commonly is measured through standardized IQ tests. "Significantly subaverage intellectual functioning" generally means an IQ of 70 or below, with a margin of error of five points in either direction. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (American Psychiatric Association, Fourth Edition 1994) ("DSM–IV") at 39; *Holmes v. State*, 671 N.E.2d 841, 850 (Ind.1996). According to the DSM–IV, intellectual functioning is secondary to adaptive behavior as an indicator of mental retardation, meaning that an individual with an IQ below 70 who exhibits adaptive behavior would not be diagnosed as mentally retarded. DSM–IV at 40.

■ Adaptive behavior refers to how well an individual deals with everyday life demands compared to other people with similar educational and social backgrounds. *Id.* Mental retardation professionals commonly gather evidence of adaptive behavior from two primary sources: standardized scales and independent sources. *Id.* The DSM–IV mentions two standardized scales which provide clinical composite scores of adaptive behavior, but notes that these standardized scales may vary in reliability depending on each individual's handicaps. *Id.* Independent sources can include, but are not limited to, teacher evaluations and school and medical records. *Id.*

Defendant argues that because all of the evidence presented at the pretrial hearing regarding his adaptive behavior came from independent sources—and because none came from standardized tests—he did not receive an appropriate evaluation, and that the inappropriate evaluation he did receive biased the trial court's findings. Defendant urges this Court to rule that the Mental Retardation Statute requires evaluation of adaptive behavior by standardized testing. However, because defendant offers no proof as to how an evaluation including standardized tests would be more appropriate than an evaluation without standardized tests, we will review only the propriety of the evaluation defendant did receive, and will not speculate as to the advantages, real or perceived, of standardized testing of adaptive behavior.

Four experts evaluated defendant to determine whether defendant was mentally retarded within the meaning of Ind.Code § 35–36–9–2. Each expert interviewed defendant in person and reviewed documents dating back to defendant's early childhood. The documents available to each expert for his review included education records, medical and treatment records, letters from social workers, and criminal records. The experts also viewed a videotaped interview of defendant with the police.

■ The sources on which the experts at least partially based their conclusions are the "reliable independent sources" from which the DSM–IV states it is helpful to gather evidence of adaptive behavior. DSM–IV at 40. The record demonstrates that each expert reviewed the independent sources available to him and relied substantially on these sources in deciding whether defendant exhibited substantial impairment of adaptive behavior. Nothing in the record tends to suggest that defendant would have received a

16. As stated above, Ind.Code § 35–36–9–2 defines a mentally retarded individual as "an individual who, before becoming twenty-two (22) years of age, manifests: (1) significantly subaverage intellectual functioning; and (2) substantial impairment of adaptive behavior[] that is documented in a court ordered evaluative report." Ind.Code § 35–36–9–2 (Supp.1994).

The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders defines mental retardation in a way that bears important similarities to—but also important distinctions from—the statutory definition:

significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C).
American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (American Psychiatric Association, Fourth Edition 1994) ("DSM–IV") at 39.

more appropriate evaluation had any of the experts assessed defendant's adaptive behavioral capabilities using a standardized test rather than by reviewing independent sources. Defendant has not proved to this Court that standardized tests better evaluate adaptive behavior. Accordingly, we cannot conclude that defendant did not receive an appropriate evaluation in this regard.

## B

Four experts evaluated defendant and each testified as to his findings at the pretrial hearing to determine whether defendant was mentally retarded. Defendant contends that their testimony does not support the trial court's finding that defendant was not mentally retarded within the meaning of Ind. Code § 35–36–9–2.

■ Dr. Berkson, the court-appointed psychiatrist, first evaluated defendant as mentally retarded but later came to believe that defendant did not exhibit significant impairment of adaptive behavior [17] and was not mentally retarded. Dr. Berkson reversed his initial opinion after watching the videotaped interview of defendant by the police. According to Dr. Berkson, defendant's behavior during the videotaped interview indicated an ability to adapt. Dr. Berkson specifically found a marked difference between the "slow and painful" manner in which defendant answered questions in the interview Dr. Berkson conducted and defendant's spontaneity and animation in the videotaped police interview.[18] Throughout his testimony, Dr. Berkson maintained his opinion that defendant exhibited "significantly subaverage intellectual functioning."

Dr. Caruana, the court-appointed clinical psychologist, interviewed defendant for three hours and administered an IQ test on which defendant scored 69. Based on this IQ score, Dr. Caruana classified defendant as "right on the line" between significantly subaverage and borderline intellectual functioning. (R. at 575.) After reviewing the independent sources available to him, Dr. Caruana concluded that defendant was not mentally retarded within the meaning of Ind.Code § 35–36–9–2, because defendant did not exhibit "substantial impairment of adaptive functioning." Dr. Caruana acknowledged some impairment in defendant's upper level intellectual skills and in his ability to conform to social norms and rules, but found defendant capable of meeting his own immediate needs and basic self care.

Defendant retained Dr. Arbit, also a clinical psychologist, to testify on defendant's behalf. Dr. Arbit believed that defendant satisfied both prongs of Ind.Code § 35–36–9–2. The other experts had relied heavily on defendant's job as an electrician's helper and on defendant's ability to drive a car in concluding that defendant did not exhibit substantial impairment of adaptive behavior. Dr. Arbit did not find defendant's work history significant because "helper electrician" is on a list of jobs that the American Association on Mental Retardation recognizes as being within the capabilities of mildly mentally retarded individuals. Dr. Arbit also distinguished skills of daily living (such as driving a car, which defendant can do) from truly adaptive behavior (such as conceptualizing the future, which, according to Dr. Arbit, defendant is unable to do). On this basis, Dr. Arbit disputed the findings of Drs. Berkson and Caruana that defendant did not exhibit substantially impaired adaptive behavior.

Finally, Dr. Obolsky, a psychiatrist, testified on behalf of the State and offered his

17. According to the DSM–IV, a mentally retarded individual will exhibit significant limitations in adaptive behavior in at least two of the following skill areas: communication, self-care, home living, social and interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. *Id.* at 39. However, Ind.Code § 35–36–9–2 is much more general and open-ended, requiring a showing of "substantial impairment of adaptive behavior" without specifying any particular skill levels.

18. Defendant argues that this videotaped interview does not accurately represent his adaptive behavior capabilities because he previously had rehearsed the contents of the interview several times with the police. Defendant contrasts this rehearsed performance with the fact that he was hearing and responding to Dr. Berkson's questions for the first time, and maintains that the Berkson interview more truly represents defendant's adaptive behavior. Br. of Appellant at 25.

opinion that defendant did not satisfy either prong of Ind.Code § 35–36–9–2 and was not mentally retarded under the definition given in the DSM–IV. Dr. Obolsky believed that most of defendant's behaviors which appeared maladaptive were actually just antisocial choices.

Synthesizing the expert testimony, we observe that three of the four experts found that defendant exhibited "significantly subaverage intellectual functioning," but that ultimately only one expert found that defendant exhibited "substantially impaired adaptive behavior." Each of the three experts based his final decision on the presence or absence of adaptive behaviors. After receiving this testimony, the trial court found defendant to be mentally retarded, but not within the meaning of Ind.Code § 35–36–9–2. Specifically, the court stated:

> I don't think there is any question that he is retarded in that respect [intellectual functioning]. But again I found and I believe now that he is able to adapt. He was living in the community. He was working. He [w]as operating an automobile. He was living with a young lady. According to her, bringing money home. He was able to go where he wanted to go.

(R. at 3041.)

■ In finding this defendant not to be mentally retarded, the trial court made a factual determination based on the evidence before it. This Court gives great deference to a trial court's findings of fact, and will disturb such findings only upon a showing of abuse of discretion. *See Smith v. State*, 686 N.E.2d 1264, 1272 (Ind.1997) (trial court's determination of competency reviewed for abuse of discretion). Here, pursuant to the Mental Retardation Statute, the trial court conducted a pretrial hearing at which it heard testimony from four experts who had evaluated defendant. Following the hearing, the trial court articulated its finding that defendant was not mentally retarded within the meaning of Ind.Code § 35–36–9–2. Having reviewed the record of the evidence presented to the trial court, we cannot conclude that the trial court abused its discretion in finding defendant not to be mentally retarded within the meaning of the statute, and we will not disturb the trial court's finding.

## C

Defendant's final argument is that the trial court, by finding that defendant was not mentally retarded under Ind.Code § 35–36–9–2, excluded the majority of mentally retarded individuals from the scope of the Mental Retardation Statute. Defendant's argument takes the following form: defendant is mildly mentally retarded but nevertheless does not satisfy the statutory requirements for mental retardation; 89% of mentally retarded individuals are mildly mentally retarded, like defendant; therefore, the majority of mentally retarded individuals would not satisfy the statutory requirements. Defendant claims that the trial court's interpretation of the statutory scheme contravenes the original intent of the legislature in enacting the Mental Retardation Statute, which, he argues, was not to exclude 89% of mentally retarded individuals from its operation. Br. of Appellant at 24; 26.

At the pretrial hearing, two experts offered their opinions as to what kind of individual would satisfy the statutory definition of mental retardation. Dr. Berkson testified that, in his opinion, the individual who would satisfy the statutory criteria for mental retardation would have an IQ of less than 50, would not be able to follow directions, handle money, read, or write, and could perform only the most simple and repetitive jobs under supervision. Dr. Caruana was of the opinion that a person who would satisfy the criteria would be unable to dress himself or herself, not know when to eat or how to cook, and would require the constant care of someone else. The trial court did not incorporate these answers into its finding that defendant was not mentally retarded within the meaning of Ind.Code § 35–36–9–2.

■ Mental retardation is a factual determination, and one which this Court is confident each trial court will make with the utmost care. As discussed in part II–B, *supra*, it is within each trial court's discretion to decide whether a particular defendant has demonstrated by clear and convincing evidence that he or she meets the criteria of the

Mental Retardation Statute and is therefore ineligible for a sentence of death or life imprisonment without parole. Defendant appears to argue that any time a trial court finds a defendant to be mentally retarded but nevertheless not to satisfy the statutory definition of mental retardation, that that defendant will be sentenced contrary to the mandate of Ind.Code § 35–50–2–9. We disagree.

▆▆▆ The Mental Retardation Statute operates in conjunction with Ind.Code § 35–50–2–9 not only to prohibit the execution or life imprisonment of a mentally retarded defendant, but also to ensure that each defendant, whether or not mentally retarded under the Mental Retardation Statute, may present in mitigation during the penalty phase whatever evidence of mental retardation is available. *See Penry,* 492 U.S. 302, 328, 109 S.Ct. 2934, 106 L.Ed.2d 256 ("jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime"). In effect, the Mental Retardation Statute and Ind.Code § 35–50–2–9 work together to the advantage of defendants who, while unable to prove by clear and convincing evidence that they are mentally retarded within the meaning of Ind.Code § 35–36–9–2, nonetheless can present evidence of mental retardation for the jury or judge to evaluate in their sentencing decisions.[19] Such is the case here. Although the trial court found defendant not to satisfy the statutory definition of mental retardation, it still found defendant to be mentally retarded and cited defendant's mental retardation as a significant mitigating factor when it declined to follow the jury's recommendation of death and instead imposed a sentence of life imprisonment without parole. We believe that the trial court's sentencing order and statement exemplify the intended interaction of the Mental Retardation Statute and Ind.Code § 35–50–2–9.

*Conclusion*

We hold that the clear and convincing standard of proof in Ind.Code § 35–36–9–4 does not violate due process, and that the trial court did not abuse its discretion in finding defendant not to be mentally retarded within the meaning of Ind.Code § 35–36–9–2. Accordingly, we affirm defendant's convictions and sentence of life imprisonment without parole.

SHEPARD, C.J., and DICKSON, SELBY and BOEHM, JJ., concur.

---

**19.** We note in this regard that it would likely be error for a trial court to exclude evidence of mental retardation at the penalty phase of a trial solely on grounds that defendant was not mentally retarded under Ind.Code § 35–36–9–2.